George V. Smith, Administrator, Appellee, v. E. J. Spirek,
Appellant.

**NEGLIGENCE:** Acts Constituting—Standing in Highway—Anticipat-
1    ing Recklessness. It is not necessarily negligence *per se* for a per-
son, after alighting from a conveyance, to stand *in the highway* for
an appreciable length of time; nor is such a person necessarily
required to anticipate that a passing conveyance will be operated
in a reckless manner. Evidence held to present a jury question
as to the negligence of both parties to the accident.

**PRINCIPAL AND AGENT:** Liability of Principal—Driver of Convey-
2    ance. The owner of a conveyance is necessarily responsible for the
negligent acts of one who is driving the conveyance in the pres-
ence of the owner and under the direction of such owner.

**NEGLIGENCE:** Last Clear Chance—Application of Rule. The driver
3    of a conveyance who discovers that a person has negligently placed
himself in a dangerous position in the highway must exercise rea-
sonable care to avoid injury to such negligent person.

*Appeal from Webster District Court.*—G. D. Thompson, Judge.

November 20, 1923.

Action to recover damages resulting from the alleged neg-
ligence of the defendant in the operation of his automobile,
causing the death of plaintiff's intestate. The opinion suf-
ficiently states the facts. Verdict of the jury finding for the
plaintiff and assessing a recovery in the sum of $5,500. From
the judgment entered defendant appeals.—*Affirmed.*

*Healy & Breen,* for appellant.

*Jacobs & McCaulley* and *Kelleher & Mitchell,* for appellee.

De Graff, J.—The controlling question in the determina-
tion of the instant appeal involves the doctrine of contributory
negligence. The decisive fact questions relate to the credibility
of two sharply defined and diametrically op-
posed versions of the circumstances and occur-
rences of the accident giving rise to the claimed
damages. This opinion will not concern itself

1. Negligence:
   acts constitut-
   ing: standing in
   highway: antici-
   pating reckless-
   ness.

primarily with the allegations of negligence of the defendant and the proof offered in support thereof. It will be necessary, however, to briefly outline the facts before entering upon a discussion of the controlling issue.

On the morning of the 29th of September, 1920, the defendant with his family drove by auto from his farm in Webster County to the little town of Yetter, in Calhoun County. The object was to visit his sister. The return trip began about 4 o'clock on the same afternoon. The general direction from Yetter to the defendant's home is easterly. The car was driven by the defendant's son, Allen, a boy about fifteen and one-half years of age. The car was an Oldsmobile, with a left-hand drive. The defendant occupied the right-hand side of the front seat, with the driver. The defendant's wife rode in the rear seat, on the north or left-hand side, and Frank Cerny, the wife's brother, sat to her right. About two miles north of Yetter, the car turned east onto a well traveled highway; and after it had gone a distance of two or three miles, it was discovered that the road was being repaired by the placement of fresh gravel, which necessitated a shifting of the gears from high to intermediate. As defendant's car was going through this gravel, it was passed by a Hudson car, driven east by Walter Hawthorne. At this time there was a third car parked on the south side of the highway, some 25 rods farther east. This third car was owned by the decedent, George Harrison. The Harrison car had been stopped on the right-hand side of the road, as the supply of gasoline had been exhausted. After the Hawthorne car had passed the defendant's car and had come alongside of the Harrison car, it also stopped, in order that Mr. Hawthorne could make inquiry of Harrison as to the cause of the trouble. Mr. Harrison at that time was on the ground, looking at his car, and after Harrison had explained the cause of his stopping, Hawthorne suggested that they drive to the Roberts farmhouse, a short distance up the road, and procure the necessary gasoline. Acting on this suggestion, Harrison got on the running board on the north side. During this time, the defendant's car was approaching the two cars, and when two or three rods behind them, sounded the horn, as an indication to the Hawthorne car to move on, so that the defendant's car could con-

tinue its progress. The Hawthorne car did proceed east on the road. At this point, the traveled highway was in good condition, with a wide grade of 32 to 36 feet, level, perfectly straight, and with an unobstructed view. When the Hawthorne car stopped the second time, the engine was not shut off, and about half of the car extended into the roadway, and the other half on the grass line.

It is the contention of the defendant that, as his car was in the very act of passing the Hawthorne car, Harrison stepped backwards off the running board, still talking to the occupants of the Hawthorne car, and in so doing, stepped directly into the path of the passing car, with but a lapse of one or two seconds from the time he stepped from the running board until he was struck by the defendant's car. Plaintiff's theory and evidence are in direct conflict.

Hawthorne testified that, as he stopped the car, Harrison "stepped off the running board, and was still talking. The conversation continued. I have no impression as to the time that elapsed between his stepping off and his being struck by the Spirek car. He was standing about three feet from the car, facing me." Mrs. Hawthorne testified: "As soon as our car stopped, Harrison stepped off of the running board." Her husband apparently sensed the danger, as he gave a warning to Harrison, "Look out, George." She further testified:

"From the position where he stood, I don't know whether he could have touched our car, but I think possibly he could. He was just about opposite the front seat, about three feet away. He had not gone either east or west, after stepping off the car. I saw the car strike him."

When the warning was given, Harrison threw up his hands, realizing apparently that the defendant's automobile was attempting to pass the Hawthorne car in such a way as to endanger his position.

Another witness, Mrs. Roberts, who was in the Roberts house on the north side of the road, and who observed the actions of Harrison as the Hawthorne car stopped the second time, testified:

"I saw the car when it stopped. I heard Mr. Hawthorne hollo to Mr. Harrison. He had seen the car before he heard

Mr. Hawthorne hollo. It had been stopped there just a short time. I could see Mr. Harrison standing there. He was near the car. I saw Mr. Harrison step ahead about one step, and then he was hit. He stepped ahead towards the Hawthorne car. I saw him move his hands. He was about three feet from the Hawthorne car before he was struck.''

Hawthorne further testified:

''When I shouted, Harrison just kind of jumped, and looked at my car like he thought maybe he could make it, and saw it was too close, and put his hands up, and it struck him. I didn't see Harrison again until the car had gotten clear over him. He was at that time up the road, I suppose, three and a half or four rods away from my car.''

Hawthorne examined the tracks in the road immediately after the accident. He testified: ''I saw where this car had come up behind mine, and it looked like it had missed my fender about a foot.''

Another bystander, named Smith, observed the tracks of the car leading back to the place past the Hawthorne car, and he corroborates the statements of Hawthorne.

The driver of the defendant's car saw Harrison on the running board, and observed him standing there when his car was about ten rods behind it. He testified:

''I knew that, when he was standing on the running board, he was just taking a short trip; and I knew, when Hawthorne stopped, that he stopped to let Harrison, who was standing on the running board, off. I was expecting him to get off.''

The radiator or the south part of the car struck Harrison. It further appears that the driver did not attempt to turn out from the line he was driving toward the Hawthorne car until within a rod of the car, and the jury was warranted in finding that at that time he was approaching the Hawthorne car at a high rate of speed. One witness says, ''25 miles an hour anyway.'' Another witness, who was working in a field on the north side of the road, saw the Spirek car pass, and he estimates its speed as 35 to 40 miles an hour. Harrison was dragged about one half the distance between the Hawthorne car and the point, some 9 or 10 rods, where the defendant's car was stopped. One witness who measured the distance from the Hawthorne car

to the point where defendant's car was stopped, states that it was 145 or 150 feet.

The driver of the Spirek car estimates the speed of his car as about 15 to 18 miles, "when our front wheels were opposite the hind wheels of the Hawthorne car. Our car was going straight east. The wheels were turned a little bit. We were going north some. From the place Harrison jumped off the running board to the place where he was struck by the north side of our radiator was altogether 10 feet; and the distance that our car went forward from the time that he jumped off was a distance of from opposite the hind wheels of the Hawthorne car to nearly opposite the front side of the Hawthorne car; and Harrison traveled more distance from the time he jumped than our car did to the place where he was struck. When Harrison started to jump and run back, he traveled faster than we did."

It is also claimed that at this time both brakes of the car were engaged. At the time that Harrison got on the running board of the Hawthorne car, the defendant's car was stalled in the gravel, and the Hawthorne car had proceeded 60 rods before the defendant's car started. This is the testimony of witness Smith, who was standing a few feet from the Spirek car when it was stalled.

Plaintiff's witnesses testified that no horn was sounded as the Spirek car approached the Hawthorne car. The testimony of the defendant makes a conflict in this particular. Not only is the proof in this regard in dispute, but there is irreconcilable conflict in several other material matters.

Was the driver of the defendant's car negligent because of his failure to operate the car with that degree of care and prudence commensurate to the safety of the defendant, who was lawfully in the highway? The jury answered this question in the affirmative. The jury was not bound to accept the defendant's version of the accident. The evidence is in sharp conflict, and we cannot escape the conclusion that the jury was fully warranted in rejecting the defendant's theory and his proof offered to support it. We conclude, as did the trial jury, that the defendant failed to operate his car, under the circumstances, with due regard to the safety of the decedent at the time and

place in question. It may not be said that the decedent was obligated to anticipate the reckless conduct of the driver of the defendant's car. It was the duty of the driver to operate his car with care, and with the requisite attention to the safety of persons upon the highway. The trial court and jury had to deal with conflicting theories, which have nothing in common. It was the province of the jury to believe or disbelieve the plaintiff's witnesses. The real dispute in this case is whether the decedent got off the Hawthorne car when it stopped, and was seen thereafter for some distance by the occupants of the Spirek car. This is the pivotal question. That they saw him on the running board is admitted. The jury was warranted, under the preponderance rule, in finding that he was standing in the roadway near the Hawthorne car when he was struck. Decedent had a lawful right to stand in the public highway, under the circumstances disclosed by this record. Neither pedestrian nor auto driver is called upon to anticipate negligence on the part of the other. Each is bound to exercise ordinary care, under the circumstances. It cannot be said, as a matter of law, that the decedent was on an unsafe part of the highway, or that he was negligent *per se* in being where he was. Reasonable care on the part of the defendant's driver would render him as safe there, if not safer, as in any part of the highway. Ordinary care would not impose upon the decedent the burden of being on the constant lookout for approaching vehicles, especially so when he was in a zone of reasonable safety at the time. We repeat that the jury was warranted in finding that the decedent was standing in the highway in close proximity to an automobile from which he had stepped, and that he was in this position when struck by the defendant's car. When the defendant saw, or with reasonable diligence could have seen, the decedent in time to so operate his car as to avoid the accident, it became his duty to so act. The path of the car was not fixed to any particular line of travel. The driver had ample space to pass the decedent on the highway so as to avoid striking him. We will not pursue the inquiry further. The adjudicated cases confirm the views herein expressed. See *Holderman v. Witmer*, 166 Iowa 406; *Rolfs v. Mullins*, 179 Iowa 1223; *Wine v. Jones*, 183 Iowa 1166; *Clay v. Iowa Tel. Co.*, 178 Iowa 67; *Read v. Rep-*

*pert,* 194 Iowa 620; *Anderson v. Wood,* 264 Pa. 98 (107 Atl. 658); *Schock v. Cooling,* 175 Mich. 313 (141 N. W. 675); *Collins v. Nelson,* 112 Wash. 71 (191 Pac. 819); *Brewster v. Barker,* 129 App. Div. 724 (113 N. Y. Supp. 1026).

Complaint is made of certain instructions given by the trial court. The eighth instruction has to do with the responsibility of defendant for the negligent acts of his driver. The evidence is without dispute that the defendant's youthful son was driving the car, with the consent of the defendant, and under his direction. The court instructed that:

**2. PRINCIPAL AND AGENT: liability of principal: driver of conveyance.**

"The defendant is held responsible for the negligent acts of his son, if any you find there were, while operating said automobile with the consent of defendant, and while defendant was riding therein."

Clearly, the negligent acts, if any, of the driver of said car under the circumstances of this case must be considered as the acts of the defendant, and the instruction merely states the rule of responsibility for negligence under the facts.

Complaint is also made of certain language used in the seventh instruction, in which it is said that:

**3. NEGLIGENCE: last clear chance: application of rule.**

"If plaintiff's intestate failed to exercise ordinary care for his own safety, and that such act or acts contributed in any degree to the cause of said injury, then the plaintiff cannot recover in this action, unless you further find that the driver of defendant's car, after discovering the dangerous position of plaintiff's intestate, failed to exercise ordinary care and prudence, under the circumstances then existing, to avoid the injury."

This instruction must necessarily be read in the light of the fact situation, as presented to the jury by the evidence. The driver of the Spirek car was bound to use reasonable care not to injure the plaintiff, even though the latter was guilty of negligence in putting himself in a position of danger, which he might have avoided by reasonable precaution. The driver knew that the Hawthorne car had stopped. He saw Harrison standing on the running board when his car was a considerable distance in the rear of the Hawthorne car. He realized that the car had stopped to let Harrison off. Under the plaintiff's testi-

mony, which was accepted by the jury as true, the defendant saw, or in the exercise of reasonable care could have seen, the Hawthorne car; and at that time, the Spirek car must have been a considerable distance back of the Hawthorne car. The testimony shows, and could be so taken by the jury, that the defendant's car passed so close to the Hawthorne car as to miss it only by a few inches. The jury could also find that the driver of the Spirek car did not turn it from the line of its direction until it was within a very few feet of the Hawthorne car. Even though we concede, as appellant contends, that a jury might find the decedent guilty of contributory negligence in standing in the highway where he was standing, thereby placing himself in a dangerous position, as that term is used in the instruction, the court was warranted in giving the instruction as to discovered peril.

As is said in *Bruggeman v. Illinois Cent. R. Co.*, 147 Iowa 187:

"It is one thing to hold that the continuing negligence of a plaintiff will prevent a recovery for a negligent omission of defendant to discover his peril, and quite another to hold that plaintiff's continuing negligence will prevent a recovery for the negligence of the defendant in failing to take proper care to avert the accident after the plaintiff's danger had been discovered and ought to have been appreciated."

See, also, *Welsh v. Tri-City R. Co.*, 148 Iowa 200; *Lundien v. Ft. Dodge, D. M. & So. R. Co.*, 166 Iowa 85.

The instruction against which complaint is lodged is not predicated on the failure of defendant to discover the plaintiff's peril, but its application is to the conduct of the driver "after discovering the dangerous position" of the decedent. The facts in this case at bar call for a qualification of the rule of contributory negligence, and clearly the defendant cannot claim prejudice.

In conclusion, the jury accepted one of two versions of how the accident occurred. It did accept the version of the plaintiff's witnesses, and thereby sustained the theory of plaintiff.

We discover·no reason why the judgment entered on the verdict should not stand, and it is—*Affirmed.*

PRESTON, C. J., EVANS and STEVENS, JJ., concur.