CLYDE HARTMAN, Administrator, Appellant, v. JOHN C. LEE, Appellee.

No. 43583.

MARCH 16, 1937.

Harold S. Thomas, for appellant.

C. A. Smedal, for appellee.

HAMILTON, J.—The accident causing the death of plaintiff's intestate occurred about 5:30 p. m. on February 2, 1935, on Primary Road No. 65, known as the Jefferson Highway, at a point a short distance north of the city of Des Moines. At the point where the accident occurred there is a graveled road from the west, called Pine Hill Drive, intersecting No. 65. At this intersection there is a store and filling station located on the north side of the graveled road and west of Primary Road No. 65. The decedent lived on No. 65 two and one-half miles north of this point, and had resided there for about four years prior to the accident. He was in the habit of walking from his residence to and from Des Moines. On the day of the accident he was returning from Des Moines, walking northward along the west edge of the pavement, as defendant's witnesses say, or upon the shale shoulder near the west edge of the pavement, and had reached a point a few feet north of the center of the graveled road above mentioned when he was struck by the defendant's Ford V-8 car, which was being driven north by the defendant on the said paved highway, No. 65, and which was, at the time, in the act of passing another car going in the same direction. All agree that the decedent at the identical time of the impact was upon the pavement, traveling facing north, near the west edge of the pavement. He was struck by the bumper of the defendant's car, precipitating him backward against the left headlight, and back over the left front fender, his head coming in contact with the left corner of the framework of the body of the car, crushing his skull and inflicting other injuries from which he died four days later, never having regained consciousness. The pavement was dry. It was daylight. The sun was shining. There was nothing to obstruct the defendant's view. For some distance the pavement was practically level. The pavement proper was 20 feet wide with smooth shale shoulders six to seven feet in width even with the surface of the pavement on each side, and, as one witness put it, the shale blends into the side of the pavement pretty closely along there. The shale was damp and wet on top and there was some water standing on the shale portion of the highway at or near the point where the accident occurred. Just prior to the accident, a few

hundred feet south, as the defendant was proceeding north, he overtook a truck and another car which was proceeding in the same direction. He passed the truck and turned back to the right side of the pavement because of two cars approaching him from the north, and as these two cars passed by, he then pulled to the left in order to pass the other car in front of him, and it was while passing this car that the accident occurred. We therefore have the situation, just prior to the accident, of the truck and the two cars proceeding northward, and the two cars proceeding southward, the decedent walking north along the edge of the west side of the pavement. Defendant was driving at a speed of approximately 30 or 35 miles per hour at the time he struck the decedent. It is the defendant's theory, which the jury evidently must have believed, and which there was ample evidence to support, that the decedent was at all times walking off the pavement and upon the shale, until just before the impact when he stepped off the shale onto the pavement directly in front of the defendant's car when the defendant's car was within six or eight feet of the place where he was struck, and that therefore it was impossible to avoid striking him, and that by so doing the decedent was guilty of contributory negligence; while it is the plaintiff's theory, and there is also evidence to support his theory, that the decedent was at all times walking upon the paved portion of the highway along the edge of the shale where he had a lawful right to be, and that there was ample space between the car on the right and the decedent to enable the defendant to pass, and that the decedent was not guilty of any negligence contributing to his injury, but that the injury was due to the negligence of the defendant in failing to keep a lookout and in failing to sound a warning in approaching and passing a pedestrian and in failing to have his automobile under control; and in failing to reduce the speed of his car in approaching and passing the decedent, and in driving his car at an excessive speed across an intersection in an attempt to pass a motor vehicle ahead.

The court submitted only two grounds of negligence, namely: (1) That the defendant suddenly drove his automobile to the left of the highway and upon that portion thereof upon which the decedent was walking without a warning signal of any kind of his intention so to do; (2) that he failed to have his automobile under control and failed to reduce its speed to a proper rate when approaching and passing decedent. And plaintiff's chief

complaint lies in the court's failure to submit the allegation of negligence contained in the petition, of the defendant's failure to keep a proper lookout. This complaint presents the only close question in the case.

From the discussion between court and counsel, in ruling upon the motion for a new trial, which is set out in the abstract, the distinguished and able trial court recognized that this matter presented a borderline question and fully considered and weighed the matter, both at the close of plaintiff's evidence in chief, and at the time the instructions were given and again in ruling upon the motion for new trial, and acted according to his best judgment deliberately, and was fearful of injecting error into the record should he submit this ground of negligence, because of a lack of evidence to support the same. Let us look at the record. Defendant and the three other occupants of his car all testify that they saw the decedent from the time they passed the truck and observed that he was walking on the shale. They all testify that he was never on the paved portion until the defendant got within six or eight feet of him, when he stepped onto the pavement, directly in front of defendant's car. Defendant testified that he was looking straight ahead of him as he was passing this car. He says: "From the time I started around the head car until the very moment of impact, I was looking straight ahead. In the interval of time when I started to go around the head car on the paving Hartman (decedent) did not look back. During that time, distance and space, Hartman did not give any signal that he was changing his course of travel. Hartman was on the pavement when I came in contact with him. Q. Now do you have any judgment or memory as to the distance you traveled from the time you saw Hartman step on the pavement until you came in actual contact with him? A. I would say not over eight feet. Q. What, if anything, had Hartman done, or did he do, other than walking along the shoulder as you have described it just before he stepped on? A. Nothing. * * * When I sounded the two signals Mr. Hartman didn't do anything only walk right straight ahead."

The three other occupants of defendant's car, two in the back seat and one in the front seat, testified in substance to the same facts. After the accident, at the point near where the impact occurred, there were three footprints, apparently made by someone stepping from the wet shale onto the pavement, two

pointing eastward and one pointing northward. These footprints were described as being from twelve to sixteen inches from the west edge of the pavement, and defendant's witnesses, who were the only eyewitnesses to the actual striking of the decedent, all agree that the decedent was from two to two and one-half feet from the west edge of the pavement when he was struck. There was the circumstance of a puddle of water on the shale near this spot, furnishing a reason for decedent stepping upon the pavement to avoid the water. Defendant's witnesses were all positive that the puddle of water extended clear to the edge of the pavement. It is true there is considerable variance between the testimony of the witnesses of the two contestants as to the exact location of this water, each side apparently endeavoring to so locate it as to serve his purpose. There was the driver of the truck, who, as a witness for the plaintiff, testified that the left window of his truck cab was open, that after defendant passed him on the left side defendant pulled back in front of him, that he recognized the defendant, Lee, as he went around. He was driving the car. He said: "As the three of us approached the scene of the accident, I saw two cars coming from the north, driving south. They both passed. When these two cars went past, Mr. Lee pulled his car to the left side of the road and went to pass the car ahead of him. The speed of Lee's car as it went around this front car was about thirty-five miles an hour. Just prior to Mr. Lee pulling his car out of the line of traffic, I saw Wilbur Ray Hartman. He was walking north on the left side of the pavement, along the west edge of the pavement. The view of Hartman was cut off when Mr. Lee pulled to the left side of the road. When he pulled over there, his car cut off my view of Mr. Hartman. Just prior to the time Lee pulled over there, I saw Mr. Hartman walking on the west edge of the pavement. The view of Hartman was cut off when Mr. Lee pulled to the left side of the road. When he pulled over there, his car cut off my view of Mr. Hartman. Just prior to the time Lee pulled over there, I saw Mr. Hartman walking on the west edge of the pavement. The next I saw a man rolling over kind of end over end off the side of the road, kind of endwise like, left him lying with his head to the north and his feet mostly south. At the time of the actual impact, Lee's car was going practically straight north. After the Lee car struck this man, it went off to the west or left side of the pavement and stopped. I estimate the front of Lee's

car traveled from the point at which it turned out to the left and until it struck this man about sixty feet. At the time the man was struck, I could not see him for Lee's car cut off my view, Lee's car was still on the paving until the man was struck.'' On re-cross examination the truck driver testified:

''Q. Just a moment, I want to ask Mr. Clouser another question. Now if I understand you, Mr. Clouser, as you were coming to the north—A. Yes, sir.

''Q. You saw Hartman upon the west shoulder? A. Yes, sir, the west edge of the pavement.

''Q. The west edge of the pavement, and you continued to see him there until the minute or the second that your view was obstructed by the Lee car passing out? A. Yes, sir.

''Q. During that time that you saw Hartman, and until your view was cut off that instant, did Hartman ever look back? A. No.''

Another witness for plaintiff, Mr. Whittaker, who lived south of the scene of the accident on Highway 65, had been to this little country store near the scene of the accident and was walking southward from the scene of the accident and passed Hartman just a few moments before he was struck. He says: ''I saw Ray Hartman as I started south. He was coming from the south going north, walking on the west edge of the pavement. I met him at the mail box, as shown in Exhibit '4'. (This mail box is located a little less than fifty feet south of the point where the accident occurred.) We spoke to each other. As we met, he went off the pavement on the shale on the west side of me and started going north and I started going south.'' He saw Lee's car turn out to pass the other car and says that the next thing he heard was a thud. He stopped and turned around and saw Hartman's body lying on the ground.

There was also another witness, a Mr. Leonard, who saw the passing cars, but did not see the actual impact, and he came to the scene of the accident immediately. He testified that he had a conversation with Lee. ''Lee was standing there by me and I asked him how it happened and he said, 'I did not see him until I was right on to him.' ''

On this point, the defendant, Lee, on cross-examination testified.

"Q. And as you approached that man on that street that day there was nothing over on the west side of the pavement? A. No.

"Q. No, and one car ahead of you, and yet you want to tell this jury that you were within 8 feet of that fellow before you saw him? A. I said after he stepped on the pavement. Before that he was on the shale shoulder.

"Q. Do you mean to tell this jury that you were within 8 feet of Hartman when he was on the pavement before you saw him? A. It wasn't very much more than that ahead of me that he stepped right over on the pavement 2 feet. * * *

"Q. You want to tell the jury that walking up there he was plodding along in the mud and the shale and not walking on the pavement? A. He wasn't walking on the pavement at any time that I saw him until he stepped there ahead of me there. I sounded my horn twice. I might have been 100, 75 to 100 feet, from Hartman when I sounded my horn twice. I sounded the two signals when I started around the slow moving car. I heard Whittaker testify this morning that Hartman, as he approached from the south was walking on the west side of the pavement and continued to walk on the west edge of the pavement until he got to the post office box where they met and that Hartman there stepped west on the shale, but my evidence is that every time I saw Hartman he was walking on the shale. My testimony is that I never saw him on the pavement until I hit him."

There is no evidence of any kind indicating the defendant's attention was diverted from the task of looking straight ahead, as he said he was doing. All agree, and the exhibited photographs in evidence show, that there was nothing to obstruct or interfere with the defendant's clear line of vision ahead. It is plaintiff's theory that since the jury was not bound to believe the defendant and his witnesses as to the place where they say Hartman was walking, namely, on the shoulder, but were at liberty to believe plaintiff's witnesses, who say that Hartman was on the pavement and not on the shoulder, and that, since defendant says that he did not see Hartman on the pavement until he was eight feet in front of him, therefore, if he was on the pavement, defendant was not keeping a lookout or he could and would have seen him on the edge of the pavement in time to have avoided striking him. He cites and relies upon the following cases: Smith v. Spirek,

196 Iowa 1328, 195 N. W. 736; Ege v. Born, 212 Iowa 1138, 236 N. W. 75; Baldwin v. Rusbult, 220 Iowa 725, 263 N. W. 279, and Orr v. Hart, 219 Iowa 408, 258 N. W. 84. While some of the discussion of the questions involved in these cases supports appellant's theory, an examination of the cases reveals that the fact situation in none of them is similar to the fact situation in the instant case. We think it must be admitted that this record presents a very close question as to whether or not the court should have submitted this additional ground of negligence. The experienced trial court fully recognized this. But how can it be said that a driver is not keeping a lookout when it is undisputed that he was looking nowhere else except straight ahead in broad daylight, and who admits that he saw the pedestrian walking ahead of him, not only at the time he struck him, but for more than a hundred feet before, and saw where he was walking? The driver claims the pedestrian was walking on the shoulder until just before he struck him, that he (the driver) saw him step from the shoulder on to the pavement. There is no circumstance indicating that he (the driver) didn't see him, except that he was struck. Was this enough to support the issue of failure to keep a lookout? Under defendant's own statement, if the jury believed the decedent was walking on the pavement at all times, they could come to no other conclusion than that he deliberately ran this man down while looking directly at him. The court has often said, each case is governed by its own peculiar facts and circumstances.

Under this record we are inclined to agree with the trial court. We are unable to discern any evidence to support the issue that the defendant failed to keep a lookout, and the trial court was warranted in refusing to submit this question to the jury. Being fully conscious of the presence of the decedent and his exact whereabouts upon the highway, and having observed his movements and this observation having continued uninterrupted to the very time of the collision, the proximate cause of the injury could not be attributed to failure to keep a lookout. Section 5031 of the Code of 1935 was enacted to cover a situation exactly such as we have here. It provides: "The person operating a motor vehicle or motorcycle shall have the same under control and shall reduce the speed to a reasonable and proper rate: 1. When approaching and passing a person walking in the traveled portion of the public highway. * * *" And the allega-

40

tion of negligence based upon this statutory provision was submitted to the jury under the court's instructions. We have considered other complaints urged by the appellant, but are unable to find sufficient merit in them to warrant discussion of the same in this opinion. No useful purpose would be served by so doing. We are satisfied that the issues were properly submitted to the jury, and the jury as the fact finding body has passed upon the questions submitted and, right or wrong, neither the trial court nor this court is warranted in interfering with the result, there being substantial evidence to support the conflicting theories as to the issues submitted for the jury's determination.

The case is accordingly affirmed.—Affirmed.

RICHARDS, C. J., and MITCHELL, PARSONS, ANDERSON, and KINTZINGER, JJ., concur.