[No. 29007.   *En Banc.*   October 14, 1943.]

Jacob Nylund, *Appellant,* v. Chester A. Johnston *et al.,* *Respondents.*[1]

J. P. Tonkoff, for appellant.

*Shank, Belt, Rode & Cook* and *Bonsted & Nichoson,* for respondents.

Steinert, J.—Plaintiff brought suit to recover damages for personal injuries sustained by him on being struck by an automobile driven by the defendant James M. Johnston, the eighteen year old son of the defendants Chester A. Johnston and Abi Johnston.

[1] Reported in 141 P. (2d) 863.

In his complaint, plaintiff alleged that the defendants Chester A. Johnston and Abi Johnston, husband and wife, were the owners of the automobile which collided with the plaintiff; that the automobile was maintained and operated for the use of the family of the defendants, was furnished to the minor son for his pleasure and as a family convey-ance, and at the time of the collision was being used by the son with the permission, consent, and direction of the parent defendants; that the parents knew that the son was a reckless, negligent, and incompetent driver, in that he continually failed to abide by the rules pertaining to the use of the highways, drove at excessive rates of speed, and failed to keep a constant lookout for others using the public roads.

The complaint further alleged that, while plaintiff was walking in a westerly direction along a street, near the southerly side of his own automobile then parked on the extreme north side of the street, he was violently struck by defendants' car then being operated by the defendant minor son.

The charges of negligence on the part of the defendant driver, as alleged in the complaint, were (1) that he drove at a speed of approximately fifty miles an hour; (2) that he failed and neglected to keep his car under control so as to be able to stop within a reasonable distance; (3) that he failed to keep a reasonably careful and prudent lookout ahead; (4) that he failed and neglected to observe the plaintiff when by the exercise of reasonable care he should have seen him; (5) that he failed and neglected to sound any warning at a time when there was danger of colliding with the plaintiff; (6) that he failed to exercise reasonable care to avoid an imminent collision; and (7) that he will-fully failed to take any precaution for the safety of the plaintiff.

In their answer, defendants admitted that the automobile which struck the plaintiff was being operated at the time by the defendant son, with the permission and consent of the defendant parents; but they denied generally all the

other allegations in the complaint. By way of an affirmative defense, they alleged that the injuries sustained by the plaintiff were caused solely by his own recklessness, negligence, and want of care. The plaintiff in turn, by his reply, denied the allegations of contributory negligence.

The cause was tried to a jury, which returned a verdict for the plaintiff. The defendants interposed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The court granted the motion for judgment notwithstanding the verdict and, further, directed that should its order granting such judgment be reversed a new trial be allowed. Judgment dismissing the action was thereupon entered. Plaintiff appealed. We shall hereinafter refer to the plaintiff as appellant, and, in view of our conclusion herein, will refer to the defendant son as though he alone were the respondent.

The assignments of error relate solely to the granting of the two motions. The fundamental questions presented by the appeal are (1) whether the respondent driver was guilty of negligence constituting a proximate cause of appellant's injuries, and (2), if so, whether appellant himself was, as a matter of law under the evidence, also guilty of negligence materially and proximately contributing to such injuries.

There was no witness who actually saw the collision. There were several persons, however, who were close by at the time and who appeared at the scene of the accident immediately following its occurrence.

The evidence, considered in the light most favorable to the appellant, is as follows: The accident occurred at about 8:30 p. m., December 31, 1941, on east Yakima avenue, approximately seventy feet east of the east line of Eighth street, in the city of Yakima. East Yakima avenue, which extends in an easterly and westerly direction, is fifty feet wide from curb to curb. It is paved in the middle to a width of thirty-five feet, with seven and one-half foot gravel and oil strips bordering the two sides of the pavement. Back of the curbs adjoining these strips are parking areas approximately sixteen feet in width, adjacent to

which, on each side of Yakima avenue, is a concrete sidewalk about seven feet wide. Eighth street extends in a northerly and southerly direction and intersects Yakima avenue at right angles.

At the southeast corner of the intersection of the two streets is a building having a frontage of seventy-five feet along Yakima avenue. The easterly twenty feet of this building is occupied by the Mayfair Tavern. On the northeast corner of the intersection there is another store building, and about seventy-five feet east of that corner there is a duplex residence which sits back about twelve feet from the northerly sidewalk on Yakima avenue. About thirty feet east of the residence there is a twenty-foot alley extending north and south.

The night in question was dark, but clear, and there was no natural obstruction to view along Yakima avenue east of Eighth street. West of Eighth street, Yakima avenue is well lighted, but in the block east of Eighth street there are no sidelights along the avenue. There is a neon sign above the Mayfair Tavern, but neither it nor the lights from within the tavern cast much of a glow out into the street.

At about eight o'clock that evening, appellant parked his Plymouth sedan next to, and parallel with, the curb on the north side of Yakima avenue, about seventy feet east of Eighth street, directly opposite the Mayfair Tavern located on the south side of the avenue. He then walked directly across Yakima avenue and entered the tavern where he remained twenty or twenty-five minutes. During that interval he drank a glass of beer, made a telephone call, and watched the operation of a pin-ball machine.

He then left the tavern, walked north from its entrance directly across the southerly sidewalk, the adjacent parking strip, the southerly gravel and oil strip, and the adjoining pavement on Yakima avenue, and approached his own automobile which was parked on the northerly side of the avenue. When about at the middle of the avenue he glanced to his right and observed the lights of an automobile ap-

proaching from the east, at a distance not stated in any of the testimony. He nevertheless proceeded forward without paying any further attention to the approaching automobile and as he neared his own car he took from his pocket his keys, among which was the ignition key, intending to enter the vehicle from its left side. On attempting to turn the handle of the left front door of the car, however, he found the door locked, and without further hesitation instantly turned to his left intending to proceed forward around the front end of his car and gain entrance thereto from the north, or right-hand, side. While in the act of turning to his left, he was struck by the respondent's automobile coming from the east along the avenue.

Appellant's actions from the time he left the tavern until he was struck are best described in his own language. On direct examination, he testified:

"Q. And what side of the car did you approach? A. Well, I approached the—that would be the right—the left-hand side of my car. Q. And what did you do then? A. The driver's side, the left-hand side. Q. That would be the side facing the tavern? A. Right. Q. And what did you do when you approached there? A. I was reaching for my° keys and I walked to the car and I turned the handle of it and, realizing it was locked, I at the same instant turned, facing west, with intentions of going around —it only unlocked on the one side and that's on the right-hand side—and with the intentions of unlocking it. I can't remember anything after that. I was hit as I turned around. Q. Were you in the act—had you started to walk toward the front of the car? A. No, I don't believe I even made any more than just that—just that left turn. I can't remember of taking a step toward the car. Q. Toward the front, you mean? A. Toward the front of it, rather. Q. You had tried the door, I believe you said? A. I had tried the door. Q. And, at that time, did you have your keys in your hand? A. Yes, I had the keys in my hand. It was in my left hand, because I'm left-handed, and I carry things in my left pocket, such as that, and I'm sure they were in my left pocket because I reached down in my pocket. Q. Now, did you see what hit you? A. No, I didn't see anything. Q. Now, when you came out of the tavern, Mr. Nylund, did you see any car coming from the

east, going west? A. From the east, going west? Q. Yes, coming toward town. A. Yes, there was lights coming west. Q. And how far away were they? A. Well, I would say—I would say—it's hard for me to say. . . . Q. . . . Now, where were you at the time you saw those lights there? Where were you on the street? A. Well, I was about the middle of the street. Q. You say you were about the middle of the street, and did you come directly out of the front of the tavern and cross the street? A. I come directly out of the tavern, but I don't know whether I crossed right directly across like the crow flies, but I may have stepped one way or the other because there was cars parked there in front and I probably walked the width of a car one way or the other—if the east or west, I can't remember that. Q. Anyway, you tell me about where you were on the street when you saw those lights. A. Well, I was about the middle of the street. . . . Q. How long would you say you were at your car before you turned to go toward the front? A. You mean how long I stood by my car? Q. Yes. A. I didn't stand there at all before I proceeded to turn."

On cross-examination he testified:

"Q. Yes. And then, when you got into the street, it would be substantially in front of the entrance to the Mayfair, wouldn't it? A. More or less, yes. Q. And, from that point, you started then straight north across the street again to your automobile? A. Yes, straight north. Q. Straight north. Now, these lights that you saw on the car —on a car coming west, you saw those lights only once, didn't you? A. Yes. Q. And that was when you say you were about in the middle of Yakima Avenue? A. Yes, I would say that. Q. Were there any lights coming from the west, going east, or any cars? A. From the west, going east? Q. That would be from your left. A. I didn't notice any cars coming through—I didn't see any. Q. You didn't see any coming, anyway. Did you look for traffic coming from your left and going east on Yakima Avenue? A. No. It was dark. There might have been a car coming. It would have been natural to look because the lights would have showed up, and I don't believe there was any car coming. Q. Well, had you looked to your right or down east before you got to the center of the street? A. No more than I looked to the west. With a flash of light at a distance, why, it naturally made me look down toward the east to recog-

nize them as lights. Q. And, as I understand it, that's the first time you had looked down there for lights? A. Well, yes, it would have been the first time, I suppose. Q. Well, after you saw the lights, you just recognized them as lights on an automobile, that's all, isn't it? A. Yes. Q. And I understand you never saw them any more after that time? A. No, I—no, the lights more or less—I was moving—I was walking, I guess, must have been walking; I wasn't standing still to be looking at the lights, I was moving toward my car. Q. But you paid no further attention to those lights—— A. (Interposing) No. Q.——that you saw down there? A. I didn't pay no more attention to those lights. Q. And you don't know what car those lights were on, whether that was the car that hit you or whether it was some other one, do you? A. No, I don't know whether it was that car that hit me. Q. Then you went on to the north to the left-hand side of your automobile, did you? A. That's right. Q. About at the front door? A. Right. Q. That's the door that, if you would get in there, you would go right in under the driver's wheel or to the wheel in the driver's seat? A. On the left-hand side. Q. And, when you stopped there at your car, you then reached in your pocket and got your car keys out? A. No, I reached in to get my keys before I got to the point of trying my car. Q. Where were you when you reached in your pocket, now, and got your car keys out? A. I was probably three or four feet from the car when I was already reaching for my keys. Q. All right. Then, by the time you actually got to the side of the car, you had your keys in your hand? A. I did. Q. And you tried the handle of the door to get in, didn't you? A. Yes, I tried the car door handle. Q. And you found that the door was locked so you couldn't get in your car, is that it? A. It was locked, which locks on the inside. Q. Yes. So then you had to get around over onto the right-hand side of your car before you could unlock it and get inside, didn't you? A. Yes, providing it was locked on that side. Q. Well, you couldn't get in from the left side, anyway? A. No. Q. So you had to go over to the right-hand side of your car, is that right? A. That would be right. Q. Then, as I understand you, you turned and faced west to start to go around the front end of your automobile? A. I turned left. Q. That would make you facing west, wouldn't it? A. Right. Q. You intended, you say, to go around the front end of your car and over to the right-hand side of it? A. Yes, that was the intention. Q.

And that's when the lights went out, as far as you're concerned? A. That's right. Q. You don't remember anything after that at all? A. No, not nothing at all. Q. And you never saw the car that hit you, didn't know it was approaching, or anything like that? A. No, I never seen no car hit me. Q. Mr. Nylund, when you came out of the Mayfair tavern, why didn't you walk down to the crosswalk on Eighth Street before crossing Yakima Avenue? A. Well, I don't know. I don't know that. I didn't. Q. You knew that there was a crosswalk down there at Eighth Street, didn't you? A. It's natural to know there's a crosswalk on every corner. Q. And, from the entrance to the Mayfair tavern, how far is it down to that crosswalk? A. Well, I'd say it's about 70 feet, possibly 80. Q. Seventy to eighty feet? A. Yes. Q. From the entrance of the tavern down to the crosswalk on Eighth Street? A. I don't think it's much over 70 feet. Q. All right, sir. Well, now, sir, if you had gone down there to cross this street, you would have come out on the north side of Yakima Avenue on the sidewalk rather than out in the middle of the street, wouldn't you? A. Yes. Q. And you could have walked east on the sidewalk on the north side of Yakima Avenue and come up on the right-hand side of your car, couldn't you? A. That's right. Q. But you don't know why you didn't do that? A. Well, I don't know why."

On redirect examination he testified:

"Q. Now, how far were you to the south of your car, Mr. Nylund, when, as you described, you didn't know anything further? A. To the south of my car? Q. You approached your car from the south, I understand, is that right? A. Yes. I got within two feet of my car, at least. Q. Well, how far would you say you were when you were struck— how far to the south of your car were you? A. That's when I was struck; it's just when I was reaching out or making the turn, at the same moment; reaching out to try the car handle, and at the same motion I turned left, and I couldn't have been any further than that, two feet or a foot and a half, possibly. Q. And, when you were hit, which direction were you facing? A. Well, I was facing west. Q. Toward Yakima? A. That's right."

There is no evidence to support the charge in the complaint that the respondent son was a continually reckless, negligent, or incompetent driver; that he ever, on prior

occasions, drove at excessive rates of speed; or that upon the occasion in question he was driving at a speed of fifty miles an hour. The only witness testifying for the appellant on the subject of speed was a truck driver who resided in the duplex house mentioned above. He had just come out onto the front porch of the house intending to go across the street to a grocery store, when he observed respondent's car approaching from the east on Yakima avenue, "just coming across the alley" midway between Eighth and Ninth streets.

On direct examination, he testified:

"Q. Well, are you capable of estimating the speed of this car that you observed as it was approaching from the east? A. Well, as to saying definitely whether the car was going so many miles an hour or whether it wasn't, why, I wouldn't say that, but I would say I think it was going around 30 or 35. Q. Between 30 and 35 miles an hour? A. I would think so. Q. Did you observe the car go by in front of you? A. How's that? Q. Did you observe— When this car was going by, did you see it in front of you? A. Yes, I saw it go along on the street. Q. What space of time elapsed when you heard the crash? A. Oh, it was just like that (illustrating). Q. Just a very short space of time? A. Very short [The distance between the alley, where the witness first observed respondent's car, and the place of collision, as measured on the map in evidence, is approximately seventy-five feet.]."

On cross-examination, the witness testified:

"Q. And there was nothing particular about this particular car you saw either, was there? A. No, there was not. Q. Just an ordinary car going down the street? A. Down the street. Q. On its own right-hand side of the road? A. Yes, sir."

Within a very few minutes after the collision, two policemen, responding to a call, appeared upon the scene. After noting the location and condition of the appellant, who was lying unconscious near the edge of the pavement on Yakima avenue, they took certain measurements. Appellant's parked car, which was sixteen feet long and six feet wide, stood against the north curb of the avenue, sixty-eight feet

east of the east line of Eighth street. His hat lay upon the pavement opposite the left front door of the car, eight and one-half feet south of the north curb line, or two and one-half feet south of the southerly side of the parked car. Near the hat lay appellant's keys. Appellant's body was lying fifty-eight feet west of the hat and six feet south of the north curb line of Yakima avenue. Other witnesses testified that, when respondent's car came to a stop, after the collision, it stood from two to five feet south, and a foot or two west, or ahead, of appellant's body.

While, for the purposes of this case, we are relying solely upon the evidence introduced by the appellant and are considering it in the light most favorable to him, we think it but proper to state briefly the evidence adduced on behalf of the respondent. James M. Johnston, the respondent driver, gave his version of the accident as follows: He was driving west along Yakima avenue between Ninth and Eighth streets at a speed of not to exceed twenty-five miles an hour. When about opposite the Mayfair Tavern he for the first time saw the appellant, who was then about six feet ahead of him and was running rapidly toward the north side of the avenue. His first view of the appellant was when the latter came into the ray of the witness' headlights. Before the respondent could apply his brake, he struck the appellant. At about the time of the impact he succeeded in applying his brake, and then brought his car to a stop as soon as possible. Respondent's testimony with respect to the speed of his automobile was corroborated by that of a disinterested witness, a traveling government inspector, who knew none of the parties to the action. He testified that he was driving with his wife along Yakima avenue toward Eighth street at a speed of twenty or twenty-five miles an hour, and that respondent's car was traveling a short distance ahead of him at approximately the same speed.

We turn now to the questions presented by the appeal.

Upon the argument on the motion for judgment notwithstanding the verdict or, in the alternative, for a new

trial, the trial court expressed the view that, in its opinion, there was no evidence of excessive speed or of anything else that would constitute negligence on the part of the respondent driver. The court felt constrained, however, to consider that question as one of fact for the jury to decide.

We are likewise of the view that there was not sufficient evidence to take the case to the jury upon the issue of the respondent's negligence. The only evidence with reference to respondent's speed was the testimony of the truck driver referred to above, who had just come out onto his front porch as respondent crossed the alley in the middle of the block. He observed the car only casually, noting that it was an ordinary car coming down the street toward him on its own right-hand side of the road. He would not say definitely at what speed the car was traveling, but merely said: "I would say I think it was going around 30 or 35." In our opinion, that testimony amounted to nothing more than a guess by one casually observing the lights of an approaching automobile, and we do not think it was sufficient to convict the respondent of driving at an excessive speed. Aside from the matter of speed, there is, in our opinion, no evidence of negligence on the part of the respondent. The mere fact that he ran into the appellant under the circumstances shown by appellant's own evidence does not of itself establish negligence on the part of the colliding driver.

However, in view of the more serious issue in the case, we will not rest our decision upon the question of lack of evidence to establish negligence on the part of the respondent, but will assume, as did the trial court, that the jury was entitled to find against the respondent upon that issue.

The vital question on the appeal is whether appellant himself was guilty of contributory negligence constituting a proximate cause of his injuries. The answer to that question depends ultimately upon the status of the appellant at the time of the collision; that is to say, whether or not he was at that time a pedestrian, and, if his status

was that of a pedestrian, what his duty was, under the existing law.

The statutory provisions pertaining to the subject are found in chapter 189, Laws of 1937, p. 835, now appearing as Rem. Rev. Stat., Vol. 7A, §§ 6360-1 to 6360-159 [P. C. §§ 2696-767 to 2696-908], both inclusive. We quote therefrom the pertinent provisions:

"§ 6360-1 [P. C. § 2696-767]. The following words and phrases, wherever used in this act, shall have the meaning as in this section ascribed to them, unless where used the context thereof shall clearly indicate to the contrary; . . .

"(ll) 'Pedestrian.' Any person afoot. . . .

"(aaa) 'Sidewalk.' That property between the curb lines or the lateral lines of a roadway, as herein defined, and the adjacent property, set aside and intended for the use of pedestrians. . . ."

" § 6360-99 [P. C. § 2696-857]. . . . Pedestrians crossing a roadway other than at intersection crosswalks shall yield the right of way to all vehicles upon the roadway."

" § 6360-101 [P. C. § 2696-859]. Pedestrians on any public highway where a sidewalk is provided shall proceed upon such sidewalk. Pedestrians on any public highway where no sidewalk is provided shall proceed on the extreme left-hand side of the roadway and upon meeting an oncoming vehicle shall step to their left and clear of the roadway."

Thus, the legislature was careful to define a pedestrian and to prescribe his duties with reference to his use of the highways. In words which require no interpretation and which anyone can readily understand it said that "pedestrian" means *any person afoot.* In this case, appellant was not inside, nor upon any part of, his parked automobile. He was *afoot,* and concededly was occupying a position on the pavement of Yakima avenue at least two and one-half feet from the left-hand side of his parked car.

Appellant concedes that "from such time as he left the Mayfair Tavern and proceeded to his car, he was a pedestrian," but he contends that "after arriving at and discovering his car locked, his status of pedestrian ended." We are in accord with appellant's concession, but we disagree with his accompanying contention. He had proceeded

across the pavement on foot; he was still on the pavement, on foot, when he tried the handle of the car door; he intended immediately to proceed farther along the pavement in a westerly direction; and he was in the very act of turning to the left for that purpose when struck from behind. His entire progress from the time he left the tavern until the moment of collision was continuous, and during all of that time he was afoot and on the pavement. Moreover, there was absolutely no emergency, nor even necessity, requiring him to approach, or be at, the left-hand side of his car. On the contrary, the sidewalks on each side of the avenue and the connecting crosswalk at the intersection seventy feet away were not only at immediate hand for his use, but, under the mandate of the statute, constituted his required course of progress and afforded him full protection. His choice of route was solely for his own convenience. We entertain no doubt whatever that appellant's status was that of a pedestrian within the meaning of the statute.

Appellant's duties as a pedestrian are made equally clear by the express provisions of the foregoing statutes. Since he was crossing the roadway at a place other than at an intersection crosswalk, he was required to yield the right of way to *all* vehicles upon the roadway, and furthermore, since a sidewalk was provided for him, he was required to proceed upon such sidewalk. Had he obeyed the statute he would not have been injured or, if he had been, he would almost certainly have had a good defense against the charge of contributory negligence.

As stated in *Benson v. Anderson,* 129 Wash. 19, 223 Pac. 1063:

"The legislature has enacted certain 'rules of the road' for the government of the conduct of persons using the highways of the state, and has declared that it shall be the duty of every person to observe them.

"The statutory enactments regulating traffic upon the public highways are made to be obeyed. They are the outgrowth of necessity. On the observance of them depends the safety of the users of such highways. Failure to obey them not only endangers the safety of the person guilty of

the disobedience, but it endangers the safety of others using them in a lawful manner. Courts, therefore, should not look lightly upon infractions of these regulations. One injured while in the act of disobedience of them should be compelled to show with clearness that his act in no way contributed to his injury."

The foregoing language in the *Benson* case was quoted with approval in *Flaumer v. Samuels*, 4 Wn. (2d) 609, 104 P. (2d) 484.

We have had frequent occasion to declare the duties of pedestrians upon the public highways, under statutes which required such pedestrians to travel on and along the left-hand side of the highway and upon meeting an oncoming vehicle to step off the paved or main traveled portion of the road, and we have consistently held that failure to comply with such requirements constitutes contributory negligence barring recovery by the injured pedestrian. *Turner v. Good*, 167 Wash. 27, 8 P. (2d) 414; *Steen v. Hedstrom*, 189 Wash. 75, 63 P. (2d) 507; *Proper v. Brenner*, 191 Wash. 540, 71 P. (2d) 389.

There is even greater reason, as well as need, for compliance with the statute in cases where sidewalks are provided for the pedestrian. It is hardly necessary to dwell upon the reasons, for they are obvious.

Appellant calls our attention to a number of cases as supporting his contention that, under the facts of this case, he cannot be held to have been guilty of contributory negligence as a matter of law. Those cases, however, not only arose prior to the enactment of the 1937 statute, quoted above, but also involved circumstances under which the injured party was at the time engaged in some work of emergency or necessity in connection with his automobile parked or stalled upon the highway. We have no such situation here.

In this case, appellant was contributorily negligent throughout the entire interval beginning with his departure from the tavern and ending in the collision. He crossed Yakima avenue between intersections instead of using the sidewalks and crosswalk; he failed to yield the right

of way to oncoming traffic; though he had observed the lights of respondent's car before, or about the time, he reached the middle of the avenue, he nevertheless proceeded forward without paying any further attention to the approaching vehicle; upon trying the handle of his car door, and while still upon the pavement, he turned to his left, with his back to the oncoming automobile, intending to proceed farther in the wrong direction. Had he turned, or even glanced, to his right, as he then should have done, he would not only have seen the approaching automobile, but could also have saved himself from his own prior contributory negligence by stepping closer to his car, the left-hand side of which was at least a foot and a half north of the north line of the paved portion of the street. The facts demonstrate not only his contributory negligence but also that such negligence was a proximate cause of his injuries. It was a most unfortunate accident, but it is one for which, under the law, the appellant may not recover.

The judgment is affirmed.

SIMPSON, C. J., BEALS, MILLARD, and JEFFERS, JJ., concur.

BLAKE, J. (dissenting)—As I view the evidence, the course plaintiff took in crossing the street and what he did while crossing has no bearing whatever on his right to recover. When struck, he had reached his car and had tried the door with the purpose of getting in on the left side. Just prior to and at the moment of impact he was in no different position from that he would have been in had he proceeded west to the intersection, crossed the street, and proceeded east on the sidewalk to his car and then gone around it to enter by the door on the left side. Obviously, any antecedent negligence on his part could not be a proximate cause of the accident.

With respect to the circumstances under which he was struck, appellant testified:

"Q. And what did you do when you approached there? A. I was reaching for my keys and I walked to the car and I turned the handle of it and, realizing it was locked, I at the same instant turned, facing west, with intentions

of going around—it only unlocked on the one side and that's on the right-hand side—and with the intentions of unlocking it. I can't remember anything after that. I was hit as I turned around. Q. Were you in the act—had you started to walk toward the front of the car? A. No, I don't believe I even made any more than just that—just that left turn. I can't remember of taking a step toward the car. Q. Toward the front, you mean? A. Toward the front of it, rather."

Now, upon these facts, which must be accepted as true, upon a motion for judgment *non obstante,* may it be said that appellant was guilty of contributory negligence as a matter of law? To so hold, it seems to me, would make it negligence *per se* for the driver of a car to attempt to get in or out of his car through the door on the left side when the car is properly parked at the side of a road or street. Such a holding does not accord with common sense nor with the law as laid down by this and other courts. In 2 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.), p. 458, § 1395, it is said:

"Thus a person standing in the street between a nearby standing automobile near the curb and approaching traffic on that side of the street cannot be said as a matter of law to be guilty of negligence in failing to observe approaching vehicles."

Ordinarily, one may stand or be upon a street or highway, if the exigencies of his situation reasonably necessitate his being there, without being chargeable with contributory negligence as a matter of law. *Stephenson v. Parton,* 89 Wash. 653, 155 Pac. 147; *Deitchler v. Ball,* 99 Wash. 483, 170 Pac. 123; *Gooschin v. Ladd,* 177 Wash. 625, 33 P. (2d) 653; *Hadley v. Simpson,* 9 Wn. (2d) 541, 115 P. (2d) 675; *Smith v. Spirek,* 196 Iowa 1328, 195 N. W. 736; *Regan v. Los Angeles Ice & Cold Storage Co.,* 46 Cal. App. 513, 189 Pac. 474. Of course, one so situated must exercise care commensurate with the hazards of traffic existing at the time and place. In the *Deitchler* case, which, upon the facts, bears close analogy to this, the court said, p. 486:

"Appellant next argues that the respondent was guilty of contributory negligence. Respondent testified in sub-

stance that, while he was putting up the top to his car and fastening the straps over the front to hold the top down, and while he was right up to the car as near as he could stand, he paid no attention to what was going on about him. Naturally this would be true, because, when he was engaged in fastening the top as it should be fastened, in standing close to his car, as he says he was, he had a right to assume that no person would run into him. It was not necessary for him to pay particular attention to passersby who had plenty of room to avoid him. The respondent, no doubt, as contended by the appellant, was required to use ordinary reasonable care for his safety, and if his testimony is to be believed at all, he did so when he was standing close to his car attending to his business, and was not putting himself in the way of danger. The respondent clearly had the right to stop his car at the place he did, and he clearly had a right to occupy a portion of the paved way in attending to whatever was necessary to be done about his car; and it was the duty of persons coming up to him to so control their cars as not to injure him, especially where there was room to avoid injury, as there evidently was in this case. In the case of *Stephenson v. Parton,* 89 Wash. 653, 155 Pac. 147, quoting from 2 R. C. L. p. 1184, we said:

" ' "If a person is standing in the highway, a driver must notice him and take care not to injure him, and a failure to see a pedestrian in the street may amount to negligence." ' "

It may be conceded that appellant, when he turned to go around in front of his car, was a pedestrian in contemplation of Rem. Rev. Stat., Vol. 7A, § 6360-101, which provides:

"Pedestrians on any public highway where a sidewalk is provided shall proceed upon such sidewalk. Pedestrians on any public highway where no sidewalk is provided shall proceed on the extreme left-hand side of the roadway and upon meeting an oncoming vehicle shall step to their left and clear of the roadway."

But, conceding that he was guilty of negligence in violating the statute, his right of recovery is not, for that reason, necessarily defeated. To bar recovery, such negligence must be a proximate cause of the accident. 2 Blash-

field, Cyclopedia of Automobile Law and Practice (Perm. ed.), p. 412, § 1291. *Collins v. Nelson,* 112 Wash. 71, 191 Pac. 819; *Cannon v. City Electric & Fixture Co.,* 158 Wash. 66, 290 Pac. 828; *Briggs v. United Fruit & Produce,* 11 Wn. (2d) 466, 119 P. (2d) 687.

Ordinarily, the question of proximate cause is for the jury. Under the facts as shown by this record, I think the question of whether appellant's violation of the statute (assuming that he did violate it) was clearly for the jury; for, under the circumstances, the jury might have found that his violation of the statute was but a fortuitous circumstance in nowise contributing to the accident. Had he turned to go *behind* his car, there would have been no violation of the statute, yet he would (the jury might conclude) have been hit anyway. Believing the evidence sufficient to take the case to the jury on the question of negligence and contributory negligence, I dissent.

ROBINSON, MALLERY, and GRADY, JJ., concur with BLAKE, J.

November 24, 1943.   Petition for rehearing denied.